UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO.:

---

MOUNIA EL-ARAR, as Personal Representative
of the Estate of WAFAE EL-ARAR,
NISRINE NAQQAD, as Personal Representative
of the Estate of KAOUTAR NAQQAD, and
ZINEB ELGHILANI, as Personal Representative
of the Estate of IMANE MALLAH

       Plaintiffs,

v.

ROYAL KAHAL RESORT LTD.,
FAIRHAVEN PROPERTIES INC.,
MICHAEL FAIRBAIRN
WENDY FAIRBAIRN,
DAVID FAIRBAIRN,
JOHN DOE,
JEFFREY MULHOLLAND,
BELIZE METAL WORKS COMPANY LIMITED,
STRUKTURE ARCHITECTS LIMITED,
ANNA MARIA ESPAT,
NAVIEN, INC.,
ANCA INTERNATIONAL CORPORATION,
ANCA GLOBAL HOLDINGS LLC,
GLOBAL CAPITAL MOBILITY, INC.
and EXPEDIA, INC.

       Defendants.

---

## COMPLAINT AND JURY DEMAND

### I. INTRODUCTION

1.    This is a civil action for wrongful death, conscious pain and suffering, punitive damages, and

product liability arising from the tragic and preventable deaths of three young Massachusetts

residents—Wafae El-Arar (age 26), Kaoutar Naqqad (age 23), and Imane Mallah (age 24)

who were overcome by carbon monoxide and died at the Royal Kahal Beach Resort in San Pedro, Belize, on or around February 20, 2025.

2.  The deaths were the direct result of a catastrophic failure of safety systems, including the defective design, warnings and instructions on the subject Navien NPE-210S tankless water heater, the gross negligence of the developers, managers, and contractors in failing to install the water heater properly, failing to properly convert it for use with the correct gas, failure to design a safe venting system, failing to investigate prior reports of other guests who reported symptoms of carbon monoxide exposure, and failing to provide a functional carbon monoxide detectors in the resort's guest suites.

3.  The victims, all Massachusetts residents, booked their travel and accommodations with the United States-based booking platform, Expedia, Inc., and were actively solicited by the Defendant Royal Kahal's marketing directed at the United States consumer market, thereby establishing continuous and systematic contacts with the Commonwealth of Massachusetts.

## II. PARTIES

### Plaintiffs

4.  Plaintiff Mounia El-Arar is the duly appointed Personal Representative of the Estate of Wafae El-Arar pursuant to a Letter of Authority for Personal Representative issued by the Suffolk County, Massachusetts, Probate and Family Court, Docket Number SU25P1193EA; and a citizen and resident of the State of North Carolina.

5.  Plaintiff Nisrine Naqqad is the duly appointed Personal Representative of the Estate of Kaoutar Naqqad pursuant to a Letter of Authority for Personal Representative issued by the Suffolk County, Massachusetts, Probate and Family Court, docket number SU25P1240EA; and a citizen and resident of the Commonwealth of Massachusetts.

6.  Plaintiff Zineb Elghilani is the duly appointed Personal Representative of the Estate of Imane Mallah pursuant to a Letter of Authority issued by the Middlesex County, Massachusetts Probate and Family Court, docket number M125P3278EA; and a citizen and resident of the Commonwealth of Massachusetts.

### Foreign Defendants

7.  Defendant Royal Kahal Resort Ltd. ("Royal Kahal") is a corporation organized in Belize with its principal place of business in Ambergris Caye, Belize; and owns, operates and manages the Royal Kahal Resort. Royal Kahal also consulted, managed, designed, constructed and/or developed the Royal Kahal development project.

8.  Defendant Fairhaven Properties, Inc. ("Fairhaven") is believed to be a corporation organized under the laws of Ontario, Canada, with its principal place of business in Chatham Ontario, and does business in Florida and Belize. Fairhaven developed, owns, manages, and operates the Royal Kahal. Fairhaven also consulted, managed, designed, constructed and/or developed the Royal Kahal development project.

9.  Defendant Michael Fairbairn is a citizen of Ontario, Canada, and a principal in Fairhaven. He is and was personally involved in the day-to-day management of Royal Kahal and was personally involved in the Royal Kahal development project.

10. Defendant Wendy Fairbairn is a citizen of Ontario, Canada, and a principal in Fairhaven. She is and was personally involved in the day-to-day management of Royal Kahal and was personally involved in the Royal Kahal development project.

11. Defendant David Fairbairn is a citizen of Ontario, Canada, and a principal in Fairhaven. He is and was personally involved in the day-to-day management of Royal Kahal and was

personally involved in the Royal Kahal development project. Michael, Wendy and David will be referred to as the Fairbairn defendants.

12. Defendant John Doe, whose precise name and address is not yet ascertained is and was the unit owner of the suite occupied by the Massachusetts decedents.

13. Defendant Jeffrey Mulholland is believed to be a citizen of Belize and/or Ontario, Canada and was the contractor who, along with his company Belize Metal Works Limited, was hired to complete the Royal Kahal development project, including but not limited to installing the resort's Navien water heaters.

14. Defendant Belize Metal Works Company Limited is organized under the laws of Belize with its principal place of business in San Ignacio, Belize and is owned by Jeffrey Mulholland. Belize Metal Works consulted, managed, designed, constructed and/or developed the Royal Kahal development project.

15. Defendant Strukture Architects Limited is a Belize-based entity with its principal place of business in Cayo, Belize, which consulted, managed, designed, constructed and/or developed the Royal Kahal development project.

16. Defendant Anna Maria Espat is a citizen of Belize and the principal and owner of Structure Architects.

**United States-Based Defendants**

17. Defendant Navien, Inc. ("Navien") is a corporation organized under the laws of California with a principal place of business in Irvine, California. Navien designs, manufactures, and distributes tankless water heaters and conducts substantial business in Massachusetts. Navien maintained a registered office in Massachusetts located at 25 Yemmallo Drive, Brockton MA. Its Foreign Corporation Certificate of Registration states that it provides "training and

sales for tankless water heaters" in Massachusetts. Through an extensive distribution network, Navien distributes its products throughout the United States, foreign countries, and Massachusetts selling thousands of water heaters nationwide. According to its website, Navien ships its products to thirteen different distributors in over ninety locations in Massachusetts alone.

18. Defendant ANCA International Corporation ("ANCA") is incorporated under the laws of Delaware with a principal place of business in New York, New York. ANCA acted as a principal Project Manager, Site Supervisor, and Sponsor for the Royal Kahal Resort.

19. Defendant ANCA Global Holdings LLC ("ANCA Holdings") is a limited liability company organized under the laws of Delaware with a principal place of business in New York, New York, and is affiliated with ANCA International Corporation and GCM.

20. Defendant Global Capital Mobility, Inc. ("GCM") is a U.S.-based corporation organized under the laws of Delaware with a principal place of business in New York, New York. GCM is the U.S. investment platform that created and funded ANCA and the various Caribbean investment funds. Defendant Global Capital Mobility (GCM) created and funded ANCA for the purpose of executing its development business while insulating itself from liability. GCM exercised complete domination and control over ANCA such that ANCA was a mere instrumentality of GCM, utilized to evade liability for negligent construction practices, including the use of unqualified personnel to install the lethal water heater. Adherence to the fiction of a separate corporate existence would sanction fraud and promote injustice, requiring this Court to pierce the corporate veil.

21. Defendant Expedia, Inc. ("Expedia") is a foreign domestic corporation organized under the laws of Washington with a principal place of business at 1111 Expedia Group Way West,

Seattle and part of the Expedia Group. Expedia is an online travel agency that transacts substantial business in Massachusetts and throughout the United States, owning and operating an online travel booking platform that markets, advertises, and sells travel services, including resort accommodations. Expedia operates and solicits business in the Commonwealth of Massachusetts, through which the Massachusetts decedents booked their accommodations at the Royal Kahal. Expedia regularly conducts business in Massachusetts and the events giving rise to this action have a direct connection to Massachusetts residents.

## JURISDICTION AND VENUE

22. Subject Matter Jurisdiction exists under 28 U.S.C. § 1332(a)(2) and (3) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Plaintiffs and the United States-Based Defendants and minimal diversity with the Foreign Defendants.

23. Personal Jurisdiction exists over the United States-Based Defendants (including, ANCA, GCM, and Expedia) because they are domiciled in the United States or maintain their principal places of business within the United States, thereby establishing continuous and systematic general jurisdiction.

24. This Court has personal jurisdiction over Navien because it conducts substantial business within the Commonwealth of Massachusetts and placed the product at issue into the stream of commerce with the expectation that it would be used by Massachusetts residents.

25. Personal Jurisdiction exists over all Defendants pursuant to the due process clause of the Constitution of the United States of America and the Massachusetts Long-Arm Statute, G.L. c. 223A, §3, and because they purposefully directed their commercial activities, including the financing, design, construction, marketing, and solicitation of guests for the Royal Kahal

Resort, toward citizens of the United States, including Massachusetts. The decedents, residents of Massachusetts, relied upon these United States-directed solicitations and booking services in securing the accommodation that ultimately led to their deaths.

26. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (3) because a substantial part of the events giving rise to the claim occurred in this District (including the solicitation of the decedents and the booking of the contract), and the Defendants are subject to the court's personal jurisdiction with respect to this action.

## FACTUAL BACKGROUND
### The Decedents, Expedia and the Royal Kahal Resort

27. In early 2025, Wafae El-Arar, Kaoutar Naqqad, and Imane Mallah ("Massachusetts decedents"), while in Massachusetts, planned a trip to Belize to celebrate Wafe Al-Arar's birthday.

28. The Massachusetts decedents viewed Expedia's booking site in early January of 2025 as they were planning their vacation. Expedia is an online travel booking platform that offers hotel accommodations to customers in Massachusetts and elsewhere.

29. Expedia holds itself out as a trusted provider of travel bookings and accommodations. It represented that the Royal Kahal offered a "tranquil gateway" and displayed "Exceptional" reviews.



30.     After the Massachusetts decedents viewed Royal Kahal on the Expedia website, Expedia sent the Massachusetts decedents retargeting ads and solicitations in Massachusetts to encourage them to book the trip.



31.  At no time did Expedia warn the Massachusetts decedents that the water heaters in the Royal Kahal's guest suites were defective and deadly or had been improperly installed or that by staying at Royal Kahal they would be at risk of death by carbon monoxide poisoning.

32.  Based on Expedia's representations, the ladies booked their accommodation at Royal Kahal.



33.  The Massachusetts decedents paid Expedia directly for their accommodation at Royal Kahal. Thereafter, upon information and belief, Expedia took its commission from the payment and passed on the balance to Royal Kahal.



34. Royal Kahal uses platforms such as Expedia to solicit and contact Massachusetts residents. On February 4, 2025, Royal Kahal used the Expedia platform to message the Massachusetts decedents.





35.   Royal Kahal also promotes its resort on its own through a United States-oriented website, Facebook and Instagram and other social media platforms. The website lists prices in U.S. dollars and not Belizean dollars, despite the fact that the official currency in Belize is the Belizean dollar and approximately 85% to 90% of its customers are from the United States.





36.   Royal Kahal regularly and intentionally solicits individuals in Massachusetts, such as the Massachusetts decedents, since a substantial percentage of its customers are from the United States, including Massachusetts. Over 90% of its website traffic is from users in the United States and its web server is located in the United States.

37.   These contacts, marketing and solicitations were a result of the Royal Kahal's own actions, not those of a third-party and were a part of the regular course of Royal Kahal's business operations.

38.   While planning their trip, The Massachusetts decedents viewed the Royal Kahal website, read the representations made by Royal Kahal on its website, spoke by phone with Royal Kahal representatives and exchanged text messages and emails with Royal Kahal representatives.

39.  Based upon these contacts, which occurred while Wafae El-Arar, Kaoutar Naqqad, and Imane Mallah were still in Massachusetts they booked a seven (7) night stay at the Royal Kahal. The Massachusetts decedents booked their stay at the Royal Kahal based solely on promotional materials and social media marketing disseminated by the Defendants, which were presented in U.S. dollars and directed at the U.S. market.

40.  Following the booking, they engaged in additional direct communications with the Royal Kahal confirming their reservations and coordinating transportation to the resort.



41.  By purposely availing itself of the privilege of conducting activities in Massachusetts, Royal Kahal invoked the benefits and protections of Massachusetts law and made its involuntary presence before Massachusetts courts foreseeable.

42.  On February 19, 2025, Wafae El-Arar, Kaoutar Naqqad, and Imane Mallah, all residents of Massachusetts, traveled from Boston, Massachusetts to Ambergris Caye, Belize.

43. Upon arrival on February 20, 2025, they checked into the "Bird of Paradise" suite (Unit 101) at Royal Kahal.

## The Incident and Discovery

44. On Thursday, February 20, 2025, the women spent the day at the beach and returned to their suite at approximately 7:00 P.M., remaining in contact with family and friends until approximately 9:00 P.M.

45. Upon activating the shower, a Navien NPE-210S Instant- On Tankless hot water heater began venting high concentrations of carbon monoxide directly into the suite.

46. The suite was not equipped with a functional carbon monoxide detector, despite representations by the Royal Kahal that comprehensive fire and carbon monoxide detection systems were in place. Post-incident reporting confirmed the suite lacked proper carbon monoxide detection devices.

47. Because carbon monoxide is odorless and colorless, the three women were unaware of the danger. They were overcome by the toxic gas and are believed to have died during the night of February 20, 2025, having suffered excruciating conscious pain and no doubt realizing that they were dying. Carbon monoxide starves the brain and heart of oxygen and victims of carbon monoxide poisoning experience headache, nausea and vomiting, confusion, anxiety and panic followed by seizures and ultimately dead.

48. The young women's bodies were discovered two days later, around noon on Saturday, February 22, 2025, by resort staff.

49. Autopsies confirmed the cause of death for all three women was acute carbon monoxide poisoning.

50.    An investigation revealed lethal toxicity levels inside the suite and established that the Navien NPE-210S water heater was the source of the lethal gas.



### Reports from Prior Guests

51.    Unknown to the Massachusetts decedents at the time they checked into their suite was the fact that prior guests had reported to Royal Kahal that they suffered symptoms consistent with exposure to carbon monoxide and reported high levels of carbon monoxide in their suites. Some of these guests later left reviews on Expedia detailing their experiences.

**2/10 Terrible**

Jonathan
Traveled with family
Apr 4, 2025

☹ Disliked: cleanliness, amenities, communication, property conditions & facilities

My family vacationed at this death trap 12/28/2024 - 1/2/2025 and barely made it out with our lives. We were hospitalized 3 times while staying at the Royal Kahal. With limited testing at the hospital it was believed to be food poisoning. But how does a healthy family get food poisoning 3 times in a week? They don't and it turns out it was carbon monoxide poisoning. We are very lucky to not have the same fate as the 3 young women who just lost their lives due to carbon monoxide poisoning. Very dangerous and dishonest place, please don't stay here!!!

**6/10 Okay**

Teresa A
Traveled with partner
Mar 2, 2025

☺ Liked: communication

Excellent location, helpful friendly staff. Spacious modern rooms. We had issues with air conditioning not working for over two days and were begrudgingly assigned another room by management. Our smoke and carbon monoxide detector went off while we were sleeping and wouldn't stop. Resort staff responded quickly, the "fix" was the remove the detector from the ceiling. I hate when people leave nit picky reviews but this is just a few of the things we noticed at this brand new luxury resort. Resort management needs to complete their punch list to succeed at this level. Bottom line the resort has a ton of positives. Great staff being first and foremost. We never expressed all of the little things we noticed with management but we were on vacation and wanted to relax. Maybe a year from now the kinks will be worked out but we'll probably find another place to stay.

See less

Stayed 7 nights in Feb 2025

**4/10 Poor**

naquana
Traveled with group
Mar 2, 2025

☺ Liked: cleanliness, amenities

☹ Disliked: property conditions & facilities

I had a wonderful stay at Royal Kahal Beach Resort from February 17th-21st. The staff was exceptional—front desk, maintenance, housekeeping, bartenders, and beach staff went above and beyond. The beauty of San Pedro, Belize, and the warmth of its people made this trip unforgettable. The rooms were spacious, beautifully detailed, and well-equipped with conveniences like multiple bathrooms, a washer/dryer, and a living area. The ocean views were breathtaking, and the resort's location on the beach, close to the port for excursions, was perfect. It's ideally situated near restaurants, activities, and shops. However, I cannot, in good faith, rate the hotel highly due to serious safety concerns. On February 18th, our carbon monoxide detector went off with levels above 400. Despite informing the front desk, the staff seemed unfamiliar with the issue. Maintenance suggested turning off the gas, but the CO levels remained dangerously high. We were left feeling uneasy. The next morning, a friend reported dizziness, which we now suspect was from CO exposure. While the hotel is beautiful, the lack of CO detectors is concerning. I urge management to address this for the safety of future guests.

See less

Stayed 4 nights in Feb 2025

52. In response to the reviews, Royal Kahal responded by stating that it was "happy to announce that we have installed carbon monoxide detectors in all of our rooms as well as have detailed air quality tests done."

**Response from Management on Apr 8, 2025**

Thank you Teresa for your review and suggestions. We are happy to announce that we have installed carbon monoxide detectors in all of our rooms.

53. Following this incident Royal Kahal removed the defective Navien NPE-210S water heaters from all of its suites and replaced them with electric water heaters.

54. Unfortunately, Royal Kahal's actions came too late to save the lives of the Massachusetts decedents.

55. Both Expedia and Royal Kahal knew or should have known of the dangerous condition of the resort's water heaters, and that prior guests had experienced symptoms of carbon monoxide poisoning, had sought medical treatment for exposure to carbon monoxide poisoning, and had detected high levels of carbon monoxide in Royal Kahal's guest suites prior to the arrival of the Massachusetts decedents.

56. Therefore, both Expedia and Royal Kahal had a duty to warn the Massachusetts decedents of the dangerous condition on the Royal Kahal premises about which they knew or should have known.

57. Expedia and Royal Kahal breached their duty to Massachusetts decedents. They were unwittingly solicited, booked, confirmed and checked-in to their suite at Royal Kahal without any warning from Expedia or Royal Kahal about the risk of carbon monoxide poisoning.

58. Defendants Royal Kahal, Fairhaven, the Fairbairn defendants, John Doe (as owner of the subject suite) ANCA, ANCA Holdings and GCM, as the owners and managers of the resort had a non-delegable duty to provide a reasonably safe accommodation for the Massachusetts decedents.

59. Defendants Royal Kahal, Fairhaven, the Fairbairn defendants, John Doe (as owner of the subject suite) ANCA, ANCA Holdings and GCM, as the owners and managers of the resort breached the non-delegable duty they owed to the Massachusetts decedents by failing to provide reasonably safe accommodation and by failing to install or activate a functional carbon monoxide detector in the guest suite (a gross deviation from established hotel safety protocols), failing to investigate the reports from prior guests of high levels of carbon

monoxide in the guest suites, and by renting a guest suite to the Massachusetts decedents with a defective, deadly and improperly installed water heater that ultimately caused their deaths.

### Development of Royal Kahal

60. At the time the Massachusetts decedents arrived at Royal Kahal it had only recently opened its doors to guests because its development had been plagued by difficulties and delays.

61. During the course of Royal Kahal's development, which began in 2018, the developers, managers and sponsors (Royal Kahal, Fairhaven, the Fairbairn defendants, ANCA, ANCA holdings and GCM ) ran out of funding, which delayed the construction considerably. Once they were able to obtain additional financing, the developers had to complete the project on a shoe-string budget.

62. The developers initially hired FT Williams & Associates to handle the project's mechanical, electrical, plumbing and engineering needs. FT Williams & Associates was the sole distributor for Navien water heaters in Belize.

63. At the developers' request, FT Williams & Associates ordered 23 Navien NPE-210S units that were delivered to Royal Kahal in October of 2018.

64. As a Navien distributor and licensed contractor, FT Williams & Associates sent its employees to Navien's headquarters in California to obtain the necessary certifications and qualifications from Navien to install Navien water heaters.

65. However, once the developers of Royal Kahal ran into financial difficulties, they fired FT Williams & Associates and hired a handyman, Jeff Mulholland, and his company, Belize Metal Works, to finish the project and install the NPE-210S water heaters.

66. Installation of Navien water heaters requires specialized training and qualifications, but Mr. Mullholland and his associates had no such training or qualifications.

**The Defective Navien NPE-210S**

67. Navien is a manufacturer of high efficiency tankless water heaters and is one of the leading suppliers of tankless gas water heaters in the United States and throughout the world. Navien has multiple facilities in the United States.

68. Navien first introduced its model NPE-210S water heater in 2013. It was designed as a wall mounted unit that could be installed indoors or outdoors and featured a forced-draft direct vent configuration.

69. It works by pulling air through a dedicated intake vent, mixing it with burning gas in the heat exchanger and then expelling the combustion gases, including carbon monoxide, though an exhaust vent that usually terminates outdoors through a wall or roof.

70. The NPE-210S was defectively designed and unreasonably dangerous at the time it left Navien's control due to the failure to include an integral Oxygen Depletion Sensor (ODS) or an automatic shut-off switch to detect dangerous carbon monoxide levels or improper combustion, despite that fact that the technology was readily available years before the subject NPE-210S left Navien's control.

71. The unit was further defective because its design permitted operation even when improperly installed, improperly converted or improperly vented, despite the foreseeable risk of improper installation or conversion in international markets where LPG is common.

72. Navien was aware that alternative designs were available that would have made the NPE-210S reasonably safe.

73. Nevertheless, Navien continued to design, manufacture, and place the NPE- 210S into the stream of commerce when it knew or should have known that it was a defective and deadly product and that doing so was a risk to the public welfare.

74. Navien made a conscious decision to continue marketing, distributing, selling and/or supplying the NPE-210S, when it knew or should have known that doing so placed an unreasonable risk of injury or death on the general public, including the Massachusetts decedents.

75. The Consumer Product Safety Commission (CPSC) has issued two separate recalls of similar Navien water heaters.

76. On December 27, 2011, CPSC issued a recall entitled "Navien Recalls Tankless Water Heaters Due to Risk of Carbon Monoxide Poisoning." CPSC noted that "An unstable connection can cause the water heater's vent collar to separate or detach if pressure is applied. A detached vent collar poses a risk of carbon monoxide poisoning to the consumer."

77. On December 20, 2018, CPSC issued a recall entitled "Navien Recalls Tankless Water Heaters and Boilers Due to Risk of Carbon Monoxide Poisoning." CPSC noted that "A kit installed on the tankless water heaters and boilers to convert them from natural gas to propane can cause the unit to produce excessive amounts of carbon monoxide, posing a risk of carbon monoxide poisoning to consumers."

### Gas Conversion and Inadequate Instructions

78. Navien designed the NPE-210S to operate with either natural gas (NG) or liquid propane gas (LPG).

79. Navien shipped the NPE-210S pre-configured for NG. To operate the unit with LPG, a conversion kit must be used to ensure safe and efficient combustion.

80. If an NPE-210S configured for NG is connected to LPG, it can "over fire" and produce excessive amounts of carbon monoxide with deadly results.

81. On the box in which the NPE-2120S is shipped Navien states "One person installation" with no further indication that the installer needs specialize training or qualification.

82. Upon opening the box, an unqualified installer would not encounter the conversion kit as the kit is packaged inside the NPE-210S unit.

83. In fact, to find the conversion kit, an installer must partially disassemble the NPE-210S by removing several screws and then removing the unit's front panel.

84. The exterior of the box is devoid of any indication that there is a conversion kit located inside the unit and is also devoid of any indication that the unit must be converted before use with LPG.

85. Removal of the front panel is not necessary for the installation of the unit, so an unqualified installer could simply install the unit, albeit improperly, without ever seeing the conversion kit.

86. Inserting the NPE-210S's intake pipe and exhaust pipe to the proper depth takes an extraordinary amount of force. Although it is critical that these pipes are inserted to the correct depth, Navien provides inadequate and insufficient instructions and warnings to alert an unqualified installer about the proper depth of insertion.

87. Loose connections on the NPE-210S and insufficient ventilation can cause carbon monoxide poisoning. However, Navien's instructions and warnings fail to adequately warn unqualified installers to the dangers associated with loose connections and improper ventilation and fail to adequately instruct unqualified installers on proper installation and ventilation.

### Unqualified Installers

88.    The consequences for improper installation of Navien's water heaters are dire. Nevertheless, prior to the incident at Royal Kahal, Navien had known for years that unqualified installers were regularly installing its water heaters. It was further aware of multiple deaths resulting from improper installation.

89.    As sophisticated developers, project managers, sponsors, and builders, Defendants Royal Kahal, Fairhaven, the Fairbairn defendants, ANCA, ANCA Holdings and GCM, Strukture Architects Limited and Anna Maria Espat should have also been aware of the consequences of improper installation.

90.    On February 21, 2019, a man in New York died from carbon monoxide poisoning, and his wife nearly died, after he improperly installed a similar Navien water heater in their home. An investigation revealed that the man failed to perform the necessary gas conversion from NG to LPG prior to use.

91.    In April of 2019, a husband and wife in Ohio and their two young children died from carbon monoxide poisoning after the husband improperly installed a similar Navien water heater which began venting carbon monoxide directly into the family's home.

92.    On December 7, 2019, a Corporal in the Indiana National Guard died from carbon monoxide poisoning in a shower trailer located on an Army base after the Army hired an unqualified handyman to install a similar Navien water heater. A subsequent investigation revealed that the handyman failed to perform the necessary gas conversion from NG to LPG.

### Failure to Warn

93.    Because Navien was aware that its NPE-210S water heaters were frequently installed by unqualified installers, it had a duty to restrict sales and instruct its suppliers and distributors

to restrict sales of the NPE-210S to qualified installers and to warn customers that only qualified installers could safely install and/or convert the product.

94. Despite the design, instructional and warning deficiencies, and associated hazards of the NPE-210S, Navien failed to restrict its sale to qualified installers and failed to adequately warn customers about the dangers associated with improper installation of the NPE-210S.

95. Because Navien knew that unqualified individuals would attempt to install its water heaters, it should have included adequate warnings along with the NPE-210S to alert installers and users to the dangers associated with, and deadly consequences of, improper installation, improper venting and improper conversion of its units, including death by carbon monoxide poisoning.

96. Because Navien knew that unqualified individuals would attempt to install its water heaters, it should have included adequate instructions along with the NPE-210S regarding proper installation, venting and conversion of its units to prevent deaths associated with carbon monoxide poisoning.

97. Nevertheless, Navien designed, manufactured, distributed, sold and/or supplied the Navien NPE-210S despite knowing that it was defectively designed and had inadequate warnings, instructions, labeling, and/or inadequate testing, in light of Navien's knowledge of the product's adverse systems.

98. Navien concealed the known risks and failed to warn of known dangers associated with improper installation and improper conversion of the NPE- 210S.

## **Undertakers Doctrine**

99. During development of Royal Kahal, Navien undertook the obligation to provide consulting services, support and assistance to Defendants Royal Kahal, Fairhaven, the Fairbairn

defendants, ANCA, ANCA Holdings and GCM, Strukture Architects Limited and Anna Maria Espat including assistance with product selection and guidance on installation and design.

100. Navien also undertook the obligation to train and certify technicians to properly install its products. Therefore, it had a duty to ensure that the installations were performed correctly.

101. Nevertheless, Navien breached its duty by failing to take any steps to learn whether the water heaters at Royal Kahal were installed correctly. As a result, the descendants.

**Improper Installation**

102. The Navien NPE-210S units that were delivered to Royal Kahal arrived with the factory default setting for NG. However, Navien knew or should have known that Belize had no infrastructure for NG and there was no NG service on Ambergris Caye where Royal Kahal is located. LPG was the only gas available to Royal Kahal.

103. Therefore, it was foreseeable to Navien that sending the NPE-210S units to Belize which were pre-configured for the wrong gas would lead to deaths by carbon monoxide poisoning.

104. This is especially true given the inadequate warnings and instructions that accompanied the units and considering that Navien was aware that its water heaters were routinely installed by unqualified installers and considering that the NPE-210S's were being delivered to a third world country where safety regulations were not enforced and where safety inspections were cursory or non-existent.

105. Likewise, Defendants Royal Kahal, Fairhaven, the Fairbairn defendants, ANCA, ANCA Holdings, GCM, Strukture Architects and Anna Maria Espat who were responsible for the design, development and management of the Royal Kahal, had a non-delegable duty to ensure that the Royal Kahal project was completed in accordance with applicable building

codes and safety requirements and that the Navien NPE-210S water heaters were properly installed.

106. On its website, Royal Kahal claims that its resort was "Built to the highest standards."

107. In promotional materials, Royal Kahal and Fairhaven contend that Fairhaven has:

> "Met the requirement of due diligence, full permitting, environmental clearances and all required approvals by the Government of Belize for the development of the Royal Kahal. Through the past 25 years, Fairhaven Properties and its management team have had a history of developing residential and commercial properties both on time and on budget. Their commitment to sourcing and utilizing the newest and most efficient technologies in both design and construction has ensured the success of their projects. With the newest venture, Fairhaven Properties brings their passion and ambition for developing highly functional and innovative buildings in Belize."

108. Nevertheless, Defendants Royal Kahal, Fairhaven, the Fairbairn defendants, ANCA, ANCA Holdings, GCM, Strukture Architects and Anna Maria Espat breached the duty they owed to the Massachusetts decedents by failing to ensure that the Royal Kahal project was completed in accordance with applicable building codes and safety requirements and by failing to ensure that the NPE-210S water heaters were properly installed.

109. It was foreseeable to Royal Kahal, Fairhaven, the Fairbairn defendants, ANCA, ANCA Holdings, GCM, Strukture Architects and Anna Maria Espat that hiring unqualified and unskilled workers to complete the complex installations and/or conversions of Navien NPE-210S water heaters, would lead to injury or death by carbon monoxide poisoning.

110. Thereafter, upon information and belief, Jeffrey Mulholland and his associates at Belize Metal Works Limited improperly installed an Navien NPE-210S unit and/or failed to perform the necessary NG to LPG conversion on the Navien NPE-210S unit in the Bird of Paradise

suite at Royal Kahal. They owed a duty to the Massachusetts decedents to perform their work in a reasonably safe manner and with reasonable care and skill.

111. Jeffrey Mullholland and Belize Metal Works Limited breached the duty they owed to the Massachusetts decedents by failing to perform their work in a reasonably safe manner, by failing to use reasonable care and skill and by otherwise breaching the standard of care for contractors generally. As a result, the Massachusetts decedents were over-come with carbon monoxide in their guest suite and died.

### COUNT I - NEGLIGENCE / WRONGFUL DEATH
**(Royal Kahal, Fairhaven, the Fairbairn Defendants, ANCA, ANCA Holdings, GCM, Jeffrey Mulholland, Belize Metal Works Company Limited, Strukture Architects Limited, Anna Maria Espat and Navien)**

112. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

113. Defendants owed a duty of care to the decedents to exercise reasonable care in the design, construction, maintenance, and management of the Royal Kahal Resort, including the duty to provide a reasonably safe premises free from lethal gases.

114. Defendants breached this duty by failing to exercise reasonable care and through the acts and omissions set forth in the Factual Background, including the failure to install functional CO detectors, the failure to investigate prior claims of exposure to carbon monoxide in the Royal Kahal guest suites, the failure to hire certified and qualified installers to install the NPE-210S, the failure to properly install and convert the NPE-210S, and the failure to design and construct a means of proper venting of carbon monoxide from the NPE-210S.

115. As a direct and proximate result of this gross negligence and breach of duty, three young Massachusetts residents died.

116.  Plaintiffs seek damages pursuant to the Massachusetts Wrongful Death Statute, G.L. c. 229, § 2, and/or applicable foreign law, including damages for the value of the decedents' lives, lost income, and loss of consortium.

## COUNT II – FAILURE TO WARN
### (Royal Kahal)

117.  Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

118.  Defendant Royal Kahal, as the owner, manager and entity in control of the Royal Kahal Resort had a duty to maintain its premises in a reasonably safe condition and to warn about hazards of which it was aware or should have been aware.

119.  At the time of the incident involving the Massachusetts decedents, Royal Kahal knew or should have known of the presence of deadly carbon monoxide in its guest suites as prior guests reported falling ill with carbon monoxide poisoning, and prior guests reported high levels of carbon monoxide in their suites.

120.  Likewise, Royal Kahal knew or should have known that the NPE-210S water heaters were defective, deadly were improperly installed and/or improperly converted and posed a risk of death from carbon monoxide poisoning.

121.  Royal Kahal breached its duty to the Massachusetts decedents by failing to warn them of the risk of death by carbon monoxide poisoning in its suites and about the dangerous condition of its NPE-210S water heaters, which was unknown to the Massachusetts decedents.

122.  As a direct and proximate result of Defendants' breach, three (3) young Massachusetts residents died, suffered conscious pain and suffering, incurred medical expenses, lost wages, and experienced other damages.

123. Defendants' actions were negligent, reckless, and showed wanton disregard for the safety of the Massachusetts decedents and other travelers.

## COUNT III – NEGLIGENT MISREPRESENTATION
### (Royal Kahal)

124. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

125. Defendant Royal Kahal owned, managed and controlled the Royal Kahal Resort premises and owed a duty to the Massachusetts decedents to make truthful, accurate and complete representations regarding the safety and suitability of the Royal Kahal Resort.

126. It represented to the Massachusetts decedents through its website that the Royal Kahal resort was built to the "highest standards" and that it provided "a safe and secure environment for its guests and owners." Royal Kahal knew that the Massachusetts decedents would rely on those statements, and the Massachusetts decedents did in fact justifiably rely on Royal Kahal's representations and booked a guest suite at the Royal Kahal Resort.

127. However, Royal Kahal breached the duty it owed to the Massachusetts decedents by failing to use reasonable care or competence to make truthful, accurate and complete representations regarding the safety and suitability of the Royal Kahal Resort. At the time it made these representations to the Massachusetts decedents, while they were still in Massachusetts, Royal Kahal knew that they were false.

128. Royal Kahal knew that far from being built to the highest standards, the project had been completed on a shoe-string budget by unqualified handymen as opposed to certified and qualified technicians necessary to perform complex installations of its NPE-2210S water heaters. Likewise, it knew that guests who had stayed in Royal Kahal's guest suites had reported experiencing the symptoms of carbon monoxide poisoning, had sought medical

treatment for carbon monoxide poisoning and had detected and reported high levels of carbon monoxide in the guest suites.

129. In their guest suite, the Massachusetts decedents did not find a "safe environment" rather, they encountered high concentrations of deadly carbon monoxide gas.

130. As a direct and proximate result of Defendant's breach, three (3) young Massachusetts residents died, suffered conscious pain and suffering, incurred medical expenses, lost wages, and experienced other damages.

### COUNT IV - BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Defective Design/Defective Product (G.L. c. 106, § 2-314)
### (Navien)

131. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

132. Defendant Navien in its regular course of business designed, manufactured, tested, inspected, distributed, marketed, sold, and introduced into the stream of commerce the NPE-210S.

133. Defendant Navien impliedly warranted that it NPE-210S was merchantable and fit for the ordinary purpose for which it was intended.

134. Defendant Navien breached this warranty because the NPE-210S was defectively designed, unreasonably dangerous and unfit for its intended use and purpose as it failed to include an integral Oxygen Depletion Sensor (ODS) or an automatic shut-off switch, because its design allowed for operation even when improperly installed or improperly converted, and because it's conversion kit was stored inside the unit which required the unit to be partially disassembled in order for it to be accessed.

135. At the time the NPE-210S was installed and used by the Massachusetts decedents, there was an unreasonable risk that the product would not perform safely and effectively for the purpose for which it was intended.

136. Defendant Navien's NPE-210S was defective when it left Navien and was supplied, distributed, sold and/or otherwise placed into the stream of commerce. It was delivered to Royal Kahal in its unaltered condition.

137. The Navien NPE-210S was installed in the Bird of Paradise Suite at Royal Kahal for use as a tankless water heater, as it was intended, and was installed in a reasonably foreseeable manner and then used by the Massachusetts decedents as it was intended and in a reasonably foreseeable manner. The Massachusetts decedents were foreseeable users of the NPE-210S.

138. The risk of death by carbon monoxide poisoning from the deadly NPE-210S outweighed the benefit of having endless hot water in a shower.

139. At the time the NPE-210S was designed, there were safer alternative designs which were economically and technologically feasible. In all reasonable probability, those alternative designs would have reduced the likelihood of death from carbon monoxide poisoning without impairing the utility of the tankless water heater.

140. The NPE-210S failed to reasonably perform as intended and resulted in the deaths of the Massachusetts decedents. Thus, the product provided no benefit to the Massachusetts decedents.

141. The NPE-210S failed the customer safety expectation test as it did not perform as safely, when used as intended or in a reasonably foreseeable manner, as an ordinary consumer would have expected.

142. The NPE-210S was not adequately packaged and labelled and did not conform to the promises or affirmations of fact made on the container or label in that the box in which it was packaged stated that it was suitable for "One person installation" giving the false impression that it did not need to be installed by a certified and qualified installer. Likewise, it was packed such that the conversion kit from NG to LPG was essentially hidden inside the NPE-210S and required partially disassembly of the product to locate it.

143.  As a proximate result of the NPE-210S' defects, the Massachusetts decedents were overcome by carbon monoxide and died.

### COUNT V -  BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### Failure to Warn/Inadequate Warnings and Instructions
### (G.L. c. 106, § 2-314)
### (Navien)

144. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

145. Defendant Navien in its regular course of business designed, manufactured, tested, inspected, distributed, marketed, sold, and introduced into the stream of commerce the NPE-210S.

146. Defendant Navien impliedly warranted that its NPE-210S was merchantable and fit for the ordinary purpose for which it was intended.

147. Defendant Navien breached this warranty because the NPE-210S was defective and unreasonably dangerous because it lacked adequate clear and conspicuous warnings and/or instructions reading the type of gas the unit was pre-configured for and regarding proper installation and conversion and venting of the unit and failed to inform unqualified installers of the dangers associated with improper installation, conversion and venting.

148. At the time the NPE-210S was installed and used by the Massachusetts decedents, there was an unreasonable risk that the product would not perform safely and effectively for the purpose for which it was intended due to the inadequate warnings and instructions.

149. Defendant Navien's NPE-210S was defective when it left Navien and was supplied, distributed, sold and/or otherwise placed into the stream of commerce. It was delivered to Royal Kahal in its unaltered condition.

150. The Navien NPE-210S was installed in the Bird of Paradise Suit at Royal Kahal for use as a tankless water heater, as it was intended, and was installed in a reasonably foreseeable manner and then used by the Massachusetts decedents as it was intended and in a reasonably foreseeable manner. The Massachusetts decedents were foreseeable users of the NPE-210S.

151. The risk of death by carbon monoxide poisoning from the deadly NPE-210S outweighed the benefit of having endless hot water in a shower.

152. At the time the NPE-210S was designed, there were safer alternative warnings and instructions which were economically and technologically feasible. In all reasonable probability, the foreseeable risks posed by the NPE-210S could have been reduced or eliminated by the adoption of safer alternative warnings and instructions. Better and more conspicuous warnings and instructions regarding proper installation, conversion and venting such as:

    a. Better and more conspicuous warnings that the unit was preconfigured for NG and/or needed to be converted before use with LPG;

    b. Better or more conspicuous warnings and instructions which state that installation needed to be completed by a qualified installer;

c.    Better or more conspicuous warnings about the consequences of improper installation, conversion and venting,

would have reduced the likelihood of improper installation, conversion and venting and thereby death from carbon monoxide poisoning.

153. The NPE-210S failed to reasonably perform as intended and resulted in the deaths of the Massachusetts decedents. Thus, the product provided no benefit to the Massachusetts decedents.

154. The NPE-210S failed the customer safety expectation test as it did not perform as safely, when used as intended or in a reasonably foreseeable manner, as an ordinary consumer would have expected.

155. The NPE-210S was not adequately packaged and labelled and did not conform to the promises or affirmations of fact made on the container or label in that the box in which it was packaged stated that it was suitable for "One person installation" giving the false impression that it did not need to be installed by a certified and qualified installer. Likewise, it was packed such that the conversion kit from NG to LPG was essentially hidden inside the NPE-210S and required partially disassembly of the product to locate it.

156. As a proximate result of the NPE-210S' defects, the Massachusetts decedents were overcome by carbon monoxide and died.

**COUNT VI**
**UNDERTAKERS DOCTRINE**
**(Navien)**

157. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

158. Defendant Navien in its regular course of business designed, manufactured, tested, inspected, distributed, marketed, sold, and introduced into the stream of commerce the NPE-210S.

159. Defendant Navien voluntarily undertook to provide services and guidance to the developers, managers, sponsors, designers and contractors working on the Royal Kahal development project, including but not limited to assistance with product selection and guidance on installation and design. Navien also undertook the obligation to train and certify technicians to properly install its NPE-210S. As such, it had a duty to exercise due care in the performance of those services it voluntarily undertook.

160. The developers, managers, sponsors, designers and contractors working on the Royal Kahal development project relied on Navien to perform such services and guidance that in the NPE-210S units would be correctly installed.

161. As a result of the foregoing, Navien had a duty to ensure that NPE-210S units were properly installed and properly converted and that the building, design and venting were adequate and safe.

162. Nevertheless, Defendant Navien, having undertaken the duty to use due care in performance of its services, breached its duty by failing to take adequate steps to learn whether the water heaters at Royal Kahal were properly installed, properly converted and/or that the building, design and venting were adequate and safe. As a result, the Massachusetts decedents were overcome by carbon monoxide and died.

### COUNT VII - PRODUCT LIABILITY - NEGLIGENCE AND BREACH OF WARRANTY
### (Navien)

163. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

164. Defendant Navien in its regular course of business designed, manufactured, tested, inspected, distributed, marketed, sold, and introduced into the stream of commerce the NPE-210S which was installed in the subject suite.

165. The heater was unreasonably dangerous and defective at the time it left Navien's control due to design defects, failure to provide adequate instructions and failure to warn, as detailed in the Factual Background.

166. As a direct and proximate result of these defects, the product emitted lethal levels of Carbon Monoxide, causing the deaths of the Massachusetts decedents.

167. Defendant Navien owed the Massachusetts decedents a duty to exercise reasonable care in the design, manufacture, testing, inspection, marketing, distribution, and sale of the Product.

168. Defendant Navien breached its duty by negligently designing, manufacturing, and distributing a defective and unreasonably dangerous product and by failing to warn of known or knowable risks.

169. Despite knowing that its NPE-210S should not be installed by unqualified installed and was in fact regularly installed by unqualified installers, it stated on its packaging that the NPE-210S was suitable for "One person installation."

170. Despite Defendant Navien knowing that customers in Belize operated on LPG, it sent the NPE-210S to Royal Kahal configured for NG, the wrong gas, and placed the conversion kit in an inconspicuous location inside the NPE-210S which required the NPE-210S to be partially disassembled before the conversion kit could be located.

171. Defendant Navien also failed to include adequate warnings and adequate instructions to alert installers to the dangers associated with improper installation and improper NG to LPG conversion.

172.  As a direct and proximate result of Defendant Navien's negligence the Massachusetts decedents were overcome by carbon monoxide and died.

## COUNT VIII – BREACH OF IMPLIED WARRANTY OF
## FITNESS FOR A PARTICULAR PURPOSE
## (G.L. c. 106, § 2-315)
## (Navien)

173.  Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein.

174.  Defendant Navien knew or had reason to know of the particular purpose for which the Product was required and that Massachusetts decedents were relying on Navien's skill and judgment.

175.  The Product was not fit for such purpose, resulting in Plaintiffs' injuries and damages.

## COUNT IX - PIERCING THE CORPORATE VEIL / ALTER EGO LIABILITY
## (Global Capital Mobility, Inc.)

176.  Plaintiffs re-allege and incorporate by reference the above paragraphs though fully set forth herein

177.  Defendant GCM utilized ANCA as an alter ego to conduct its development and financing business in a manner that insulated GCM from liability.

178.  GCM is vicariously and directly liable for the acts and omissions of ANCA and its affiliated entities.

## COUNT X - FAILURE TO WARN
## (Expedia)

179.  Plaintiffs re-allege and incorporate by reference the above paragraphs though fully set forth herein.

180.  Defendant Expedia owed a duty to warn of known or reasonably discoverable dangerous conditions associated with resort accommodations they advertised and to disclose material

safety information that they knew, or reasonably should have known, would be relied upon by consumers in selecting accommodations.

181. This duty arises from:

a. The special relationship created by Defendants' comprehensive representations, marketing, and assurances of quality and safety that induced plaintiff's reliance;
b. The reasonably foreseeable risk that travelers would rely on Defendants' platforms in selecting accommodations and on the safety information provided; and
c. Instances where Defendants possessed or reasonably could have obtained actual knowledge of specific dangerous conditions at the Resort prior to Plaintiff's injury.

182. Defendants breached the duty to warn by failing to disclose known or reasonably discoverable hazards associated with the Resort, including failing to provide accurate or adequate warnings of these dangerous conditions, and by continuing to market the Resort without adequate safety disclosures.

183. As a direct and proximate result of Defendants' breach, three (3) young Massachusetts residents died, suffered conscious pain and suffering, incurred medical expenses, lost wages, and experienced other damages.

184. Defendants' actions were negligent, reckless, and showed wanton disregard for the safety of the Massachusetts decedents and other travelers.

## COUNT XI - GROSS NEGLIGENCE
### (All Defendants)

185. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein

186. Defendants acted with a complete and reckless disregard for the safety of the decedents, engaging in willful and wanton misconduct in the events leading up to and immediately following the Incident.

The gross negligence of the Defendants was the direct and proximate cause of the Plaintiffs' injuries and damages.

## COUNT XII - CONSCIOUS PAIN AND SUFFERING
### (All Defendants)

187. Plaintiffs re-allege and incorporate by reference the above paragraphs as though fully set forth herein

188. Prior to their deaths, Wafae El-Arar, Kaoutar Naqqad, and Imane Mallah were conscious and aware of their physical distress, suffering violent physical symptoms, and terror before losing consciousness.

189. Plaintiffs assert a claim for the conscious pain and suffering of the decedents pursuant to G.L. c. 229, § 6 and applicable common law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, as follows:

1. Awarding Plaintiffs damages for wrongful death in an amount to be determined at trial, including the fair monetary value of the decedents to the persons entitled to receive damages.

2. Awarding Plaintiffs damages for the Conscious Pain and Suffering of the decedents.

3. Awarding Punitive Damages for the Defendants' gross negligence and willful, wanton, or reckless conduct.

4. Awarding Plaintiffs their costs of this action and reasonable attorney fees.

5.    Awarding pre-judgment and post-judgment interest as allowed by law and

6.    Granting such other and further relief as this Court deems just and proper.

### JURY DEMAND

 Plaintiffs hereby demand a trial by jury on all claims so triable.

Respectfully submitted, Plaintiffs
By Their Attorneys,


*/s/Louis J. Muggeo*
Louis J. Muggeo, Esq. (BBO #359220)
Jared J. Muggeo, Esq. (BBO #699190)
LOUIS J. MUGGEO & ASSOCIATES
133 Washington Street
Salem, MA  01970
(978) 741-1177
lmuggeo@ljmassoc.com
jared@ljmassoc.com

Dated: February 3, 2026